867 F.2d 1344
 57 USLW 2560, 51 Ed. Law Rep. 1169
 ALABAMA STUDENT PARTY, an unincorporated association;
Cheyenne Miranda; Bertram Fairries; Doug Styles;
Scott Sims; Jeff Kimel; Tammy
McKinney; and Jerry W. Dyess,
Jr., Plaintiffs-Appellants,
v.
STUDENT GOVERNMENT ASSOCIATION OF THE UNIVERSITY OF ALABAMA;
John Merrill in his official capacity as President of the
Student Government Association; Joab Thomas in his official
capacity as President of the University of Alabama; and
their respective agents, servants, assigns, successors in
office, Defendants- Appellees.
 No. 87-7090.
 United States Court of Appeals,
Eleventh Circuit.
 March 16, 1989.
 
 Edward Still, Reeves & Still, Birmingham, Ala., Neil Bradley, Atlanta, Ga., for plaintiffs-appellants.
 Paul E. Skidmore, University Counsel, George B. Gordon, The University of AL System, Tuscaloosa, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before RONEY, Chief Judge, TJOFLAT, Circuit Judge, and PAUL*, District Judge.
 RONEY, Chief Judge:
 
 
 1
 This appeal is from a district court order upholding against a First Amendment challenge certain election regulations of the Student Government Association (SGA) of the University of Alabama. We affirm, although on slightly different grounds than the district court.
 
 
 2
 Plaintiffs, individual students and an association of students interested in running for office, challenged regulations adopted by the SGA which (1) restricted the distribution of campaign literature to three days prior to the election and only at residences or outside of campus buildings; (2) prohibited distribution of campaign literature on election day; and (3) limited open forums or debates to the week of the election.
 
 
 3
 The district court first determined that the SGA was a state actor subject to the same constitutional restrictions as the University itself. It then concluded that the challenged regulations met the reasonableness standard used to measure the constitutionality of speech restrictions in a non-public forum, using the framework established by Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).
 
 
 4
 Although we agree that the challenged regulations should be evaluated under a reasonableness standard, we do not believe that Perry is the proper vehicle to do so here. Rather, the cases applying Perry in a school setting deal with situations where some student group is seeking access, or funding, or some similar treatment that other student groups are already receiving. See, e.g., Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). This analysis would more properly apply if the SGA was seeking access to the University campus for its elections. But that is not the case here.
 
 
 5
 The United States Supreme Court has consistently reaffirmed the right of state universities to "make academic judgments as to how best to allocate scarce resources," and to determine independently on academic grounds "who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Widmar v. Vincent, 454 U.S. 263, 276, 102 S.Ct. 269, 278, 70 L.Ed.2d 440 (1981) (citations omitted). The central justification for a student government organization is that it supports the educational mission of the University. This deference to the educational mission of institutes of higher learning has resulted in the recognition of a "university's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education." Id. at 277, 102 S.Ct. at 278.
 
 
 6
 The proper analysis centers on the level of control a university may exert over the school-related activities of its students. The question is whether it is unconstitutional for a university, which need not have a student government association at all, to regulate the manner in which the Association runs its elections. That question is a different one than posed by election restrictions in a non-academic setting. For example, in Sellman v. Baruch College, 482 F.Supp. 475 (S.D.N.Y.1979), the court upheld requirements that candidates for student office register for 12 credits and maintain a 2.5 grade point average. In deciding the restrictions were reasonable and in furtherance of legitimate state interests, the court stated:
 
 
 7
 The fundamental purpose of Baruch College is to educate students. Participation in student government is known to be a demanding and time-consuming activity that those interested in the progress and welfare of the students might reasonably conclude is detrimental to the academic progress of students whose grades are only barely above the passing rate.
 
 
 8
 Id. at 480.
 
 
 9
 Of course, academic qualifications for public office could never withstand constitutional scrutiny in the "real world." But this is a university, whose primary purpose is education, not electioneering. Constitutional protections must be analyzed with due regard to that educational purpose, an approach that has been consistently adopted by the courts.
 
 
 10
 Just last term, the Supreme Court reaffirmed that "the First Amendment rights of students in the public schools 'are not automatically coextensive with the rights of adults in other settings.' " Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988) (quoting Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986)) and that the rights must be considered in "light of the special characteristics of the school environment." Tinker v. Des Moines Indep. Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). See also, New Jersey v. T.L.O., 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) (holding in a Fourth Amendment context that "school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject.")
 
 
 11
 In Hazelwood, the Court found that the First Amendment was not violated when school officials withdrew two stories about divorce and teenage pregnancy from the school newspaper. There, the Court specifically addressed the right of educators to control school-related speech, holding that such control may be exercised "so long as their actions are reasonably related to legitimate pedagogical concerns." 108 S.Ct. at 571. Similarly, in Bethel, the Court found that the First Amendment did not prohibit school officials from punishing a student who used "vulgar and lewd" speech, although not legally obscene, in a high school assembly or from determining that such speech would "undermine the school's basic educational mission." 478 U.S. at 685, 106 S.Ct. at 3166. Again, the Court recognized that the standards governing burdens on the speech of adults to an audience of adults may differ from the standards governing speech of students in public schools. Id. at 682, 106 S.Ct. at 3164.
 
 
 12
 Even in Tinker, upholding the right of three students to wear black armbands in protest of the Vietnam war, the Court made clear that this right existed only so long as the students did not present a "material and substantial interference with schoolwork or discipline." 393 U.S. at 511, 89 S.Ct. at 739. It is significant that the Court in Tinker also spoke in terms of "reasonableness."
 
 
 13
 The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances.
 
 
 14
 Id. at 513, 89 S.Ct. at 740 (emphasis added). Similarly, the Court noted that the record did not demonstrate that school authorities reasonably feared school disruption. Id. at 514, 89 S.Ct. at 740-41. Thus, the SGA rules ought to be assessed on the basis of their reasonableness as well.
 
 
 15
 According to the depositions in this case, the University views its student government association, including the election campaigns, as a "learning laboratory," similar to the student newspaper or student yearbook. This "laboratory" allows students who "aspire to public service, public life, [and who] want to gain some experience and expertise in better understanding the way in which democracy functions," an opportunity to learn how to work within the democratic process. These statements indicate that student government and the campaigns associated with it do not constitute a forum generally open to the public, or a segment of the public, for communicative purposes, but rather constitute a forum reserved for its intended purpose, a supervised learning experience for students interested in politics and government.
 
 
 16
 It should be noted that the Supreme Court was mindful in Hazelwood of the distinct issues presented to it by the facts in that case and in Tinker. The Court recognized there is a difference between speech a school must tolerate and speech a school must affirmatively promote. In Hazelwood, the school could determine what was appropriate in a school-sponsored student newspaper when that newspaper was legitimately part of the learning experience, the curriculum, of the school. Certainly, the school was not required to establish a newspaper. Equally clear is that the mere establishment of the newspaper does not then magically afford it all the First Amendment rights that exist for publications outside of a school setting. In Tinker, the issue was distinct. There, the regulation selected out a particular message, which just happened to occur on school premises, for punishment. That is not before this Court.
 
 
 17
 The University should be entitled to place reasonable restrictions on this learning experience. The district court concluded after a hearing that although the regulations were "rather narrow and limiting," they were neither "unreasonable," nor "arbitrary and capricious." The district court noted that by promulgating such regulations, the University sought to minimize the disruptive effect of campus electioneering, an interest which the district court found to be legitimate. There was no evidence that the regulations were anything but viewpoint-neutral.
 
 
 18
 The University judgment on matters such as this should be given great deference by federal courts. This Court should honor the traditional "reluctance to trench on the prerogatives of state and local educational institutions." Regents of University of Michigan v. Ewing, 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985). The reason for this is that "[a]cademic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." Id. at 226 n. 12, 106 S.Ct. at 514 n. 12 (citations omitted). In the present case, and in other school cases raising similar First Amendment challenges, these principles translate into a degree of deference to school officials who seek to reasonably regulate speech and campus activities in furtherance of the school's educational mission. Accordingly, the decision of the district court is
 
 
 19
 AFFIRMED.
 
 TJOFLAT, Circuit Judge, dissenting:
 
 20
 This case concerns the validity of regulations promulgated by a university student government that restrict election campaigning for student government offices. Appellants, a student political "party" and seven of the party's members, contend that the regulations violate their first amendment right to freedom of speech. The district court found that the university campus is not a public forum open for the discussion of student government elections; the court therefore upheld the regulations and denied appellants' request for declaratory and injunctive relief. The majority concludes that these regulations do not unconstitutionally restrict the free expression of the students at the University of Alabama. I respectfully dissent for two reasons: first, because I believe that the University has advanced no educational interest in the election regulations; and second, because even if such an interest were advanced, the challenged regulations are overbroad.
 
 I.
 
 21
 The University of Alabama is a state university located in Tuscaloosa, Alabama. The University has created a student organization, known as the Student Government Association (SGA). The organization's membership consists of all full-time students registered at the University.[1] The officers of the SGA are elected annually by its members. Some of these members have formed political "parties" to improve their chances of being elected to office in the SGA. One such party is appellant Alabama Student Party. The party has approximately eighty members, and several have run for office in the SGA.
 
 
 22
 The SGA has promulgated certain "Campaign Rules and Regulations." These rules provide, in relevant part, that:
 
 
 23
 Section 1. NEWSPAPER FACILITIES So long as equal space and facilities are made available to all candidates in the same office, any publication may be used in connection with campaign advertising. No more than one page cumulative total of standard size of newspaper may be used by candidates for President, Vice President, or Treasurer during the entire campaign. Candidates for school offices, Student Senate, and the Media Planning Board may to [sic] use more than one half page total cumulative.
 
 Section 2. PLACEMENT OF CAMPAIGN MATERIALS
 
 24
 a. campaign materials may be distributed no earlier than three days prior to the election.
 
 
 25
 b. materials, including handouts and flyers, shall be distributed only at a place of residence or outside of a public building on campus by hand, and under no circumstances shall it be deposited in any mailbox or affixed to any surface, or left in any building, classrooms, or any other public building on or off campus with the exception of a place of residence. This is to include all walls, windows, vehicles, etc.
 
 
 26
 Section 3. REMOVAL OF CAMPAIGN MATERIALS. All campaign material must be removed from all locations by 11:59 p.m. the day preceding the election date.
 
 
 27
 ....
 
 
 28
 Section 5.
 
 
 29
 a. There shall be no dissemination of campaign materials as defined in Section 7 of this chapter, on the day of the elections.
 
 
 30
 b. No material relating to any candidates for election may be generally distributed on Election Day within any academic building of the campus, or within one hundred feet of such a building.
 
 
 31
 c. No material relating to any candidates for election may be generally distributed on Election Day within any building containing a polling place, or within one hundred feet of such a building.
 
 
 32
 ....
 
 Section 7. CAMPAIGN MATERIALS LIMITATIONS
 
 33
 a. The following definitions and limitations shall apply:
 
 
 34
 1. a handout (to include doorknockers, cards, and pamphlets) shall be no longer than 9" X 14".
 
 
 35
 2. a flyer shall be xeroxed or memeographed [sic] material (on regular or electrostatic stencil) on regular or legal-sized paper.
 
 
 36
 b. A candidate for executive office may have one handout and no more than 2 different flyers. A candidate for any other office may have one kind of handout or flyer.
 
 
 37
 Section 8. ELECTION FORUMS. The Elections Chairman shall be responsible for establishing open forums on campus during the campaign week to which all executive candidates for offices shall be invited to present their views. The Elections Chairman shall be responsible for publicizing these forums and notifying the candidates. All forums must register with the Elections Chairman not less than 48 hours before the forum. Candidates for other offices may be invited to participate if requested by the sponsor of the particular forum. Forums shall be limited to one per night. The Elections Chairman shall be responsible for establishing rules governing these forums. Any registered organization which is determined with reasonable certainty by the Elections Chairman to have violated these regulations shall be brought before the student court. If determined guilty, the organization shall:
 
 
 38
 a. be fined not more than $100.
 
 
 39
 b. lose its University registration and be ineligible for SGA funding for one year.
 
 
 40
 (emphasis added). The University itself has imposed no regulations on student elections other than the minor time, place, and manner restrictions applicable to all topics of speech. For example, the University prohibits students from placing advertisements on vehicles without the owner's permission, and attaching posters to the walls of university buildings, except on bulletin boards.[2]
 
 
 41
 Appellants believe that the SGA's campaign regulations unduly restrict their right to freedom of speech in violation of the first and fourteenth amendments to the United States Constitution; consequently, they brought this suit for declaratory and injunctive relief to prevent the SGA and the University from enforcing the regulations.[3] After a bench trial, the court nied appellants' application and entered final judgment against them. The court found that the SGA and the University are state actors, and thus subject to the first and fourteenth amendments, and that the SGA regulations restrict speech based on its content, as opposed to the time, place, and manner in which speech can be delivered; nevertheless, the court concluded that the regulations pass constitutional muster.
 
 II.
 
 42
 The parties do not dispute the district court's conclusion that the SGA and the University are state actors and thus subject to the first and fourteenth amendments. Nor is there any dispute that the SGA regulations restrict speech based on its content, as opposed to the time, place, and manner of speech.[4] The question thus becomes whether the district court applied the correct constitutional standard in assessing the validity of the challenged regulations.
 
 A.
 
 43
 It is well settled that a state's ability to restrict speech that occurs on government property depends on the nature of the forum created by the property involved. See Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 799-802, 105 S.Ct. 3439, 3448-49, 87 L.Ed.2d 567 (1985); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983); United States v. Belsky, 799 F.2d 1485, 1488-89 (11th Cir.1986). The Supreme Court has identified three such fora. The first is the "traditional public forum"--a place which has " 'immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " Perry, 460 U.S. at 45, 103 S.Ct. at 954-55 (quoting Hague v. Committee for Indus. Org., 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939)). Examples of traditional public fora include public streets, sidewalks, and parks. See United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). In a traditional public forum, a state's power to impose a content-based restriction on speech is extremely limited: the state may enforce such a restriction only if it demonstrates "that [the restriction] is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry, 460 U.S. at 45-46, 103 S.Ct. at 955 (emphasis added).
 
 
 44
 At the opposite end of the spectrum is the "nonpublic forum"--government property which is "not by tradition or designation a forum for public communication." Id. at 46, 103 S.Ct. at 955. In a nonpublic forum, the government may impose reasonable content-based restrictions on speech, provided that the restrictions are not viewpoint-based. See, id.; see also Cornelius, 473 U.S. at 800, 105 S.Ct. at 3449.
 
 
 45
 The third type of government property is the "limited public forum," a combination of the above two types of fora. A limited public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." Id. at 802, 105 S.Ct. at 3449. In creating such a forum, the government may limit its use to the discussion of certain subjects or to speech by certain speakers. See Perry, 460 U.S. at 45 n. 7, 103 S.Ct. at 955 n. 7. Thus, for those topics or speakers for which the government has made the property available, a limited public forum is treated as a public forum; for all other topics or speakers, it is treated as a nonpublic forum. Once the government has created a limited public forum, it is not required to maintain it indefinitely. As long as the government maintains the forum, however, it is bound by the same constitutional standards that apply in a traditional public forum context: "a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." Id. at 46, 103 S.Ct. at 955.
 
 
 46
 Perry and its progeny thus require the courts to balance the public interest in a protected forum for free expression with the government interest in regulating the use of its own property. Depending on the nature of the forum, the government must justify its regulatory action as either reasonable or necessary to further a compelling interest.
 
 B.
 
 47
 Contrary to the assertions of the majority and the findings of the district court, the record is barren of any evidence that the SGA campaign regulations were promulgated, or are currently maintained, to further some educational interest. In fact, the record demonstrates quite the contrary: that the University does not even approve of the challenged regulations. Because this conclusion is at odds with the view of the record taken by the majority, I present the evidence in some detail.
 
 
 48
 The only witnesses presented on behalf of the University were John Baier, the University's Vice-President for Student Affairs, and Melford Espy, the University's former Director of Student Life. When questioned concerning the educational purpose of the SGA, Mr. Baier's testimony was as follows:
 
 
 49
 Q. From an educational standpoint what's the function of having a Student Government Association?
 
 
 50
 A. It's very similar to having a chemistry lab. Government is an important part of our democracy and a university campus needs to foster a laboratory, living, learning laboratory environment--in which students who aspire to public service, public life, that want to gain some experience and expertise in better understanding the way in which a democracy functions, debate, executive powers, judicial powers, legislative powers, the balance of government between the three branches, that the university therefore encourages and fosters there to be student government organizations at multiple levels on the campus.... So, the Student Government Association is simply a place in which there are a larger number of students dealing with the breadth of issues that go across the campus, that have an opportunity to experience firsthand the democratic process under which we all live and ascribe. quently they find that it is hard to work with, and that's what we hope they're learning. We hope that. That's why I say we don't regulate what we do, because part of the learning process is that they have to come to grips with the legislative side of things, the executive side, the judicial side, the difference of opinion, the debate, the controversies that go along with the making of laws, the enforcement of laws, and so we advise them in all of these things, and that's why I make comments to the student press as to whether I think something is fair or unfair or right or wrong, but I don't impose those views on the organization because it is a student government association and it is not a university government association.
 
 
 51
 Q. And I presume as a part of that, that the University believes that there is an educational function in allowing the students to govern themselves even if they govern themselves badly; is that correct?
 
 
 52
 ....
 
 
 53
 A. That's where the educational responsibility comes in. We take it very seriously to try to get them to govern themselves well and properly and consistently and fairly.
 
 
 54
 This interchange shows that the SGA's only "educational mission," at least in the eyes of the University, is to provide students a realistic experience in self-government. As the testimony of Mr. Espy indicates, the University has never claimed that the SGA election regulations further that goal:
 
 
 55
 Q. Does the university have any interest in seeing that these campaign regulations are enforced?
 
 
 56
 A. No, that's, you know, other than the fact that the student body who made them and that things are run in a timely fashion in terms of the candidates, in terms of the abiding by the rules that the students have set down by themselves, I don't see any, and the university has no vested interest in it because it is a governing body of the students and not of the University of Alabama.
 
 
 57
 Q. Does the university have any interest in even the existence of the Student Government Association? Would it make a big difference if the Student Government Association evaporated?
 
 
 58
 ....
 
 
 59
 A. I think that it would in that it would eliminate a learning laboratory, just as THE CRIMSON WHITE or the COROLLA or any other avenue in which students could project their interest or practice things that they learn in the classroom in terms of governmental structure, or socialization, or those types of things.
 
 
 60
 In fact, the University, through Mr. Baier, has indicated that it does not approve of the challenged regulations, finding them unduly restrictive of its students' free speech:
 
 
 61
 Q. Now, in [a November 15, 1985 article in The Crimson White, the University school newspaper], the article states, "Baier said he was also disappointed the Senate chose to keep SGA election campaigning at a three-day limit." Your quote now: "I agree that they should restrict the placement of advertisements to ensure orderliness to the campus community. However, it is inappropriate to restrict the freedom of speech." ... Did you make that statement?
 
 
 62
 A. Yes, I did.
 
 
 63
 ....
 
 
 64
 [A]ny campus has a certain percentage of students who live in the residence halls. Usually that figure is twenty-five to thirty-five percent where I've been and the remainder of the students live off the campus in apartments or homes. There are a multiplicity of colleges and schools spread out around the campus. To communicate in a personal way with a significant portion of the student body, to communicate your views, as to your views of the student government, or what you would do if you would be elected, it generally takes more than two or three days to get to all of those various places and do all of those various things. So, my orientation has been that a test of reasonableness of how many places can you get to in a given evening, since they're in school in the daytime, can a person reasonably get to canvass the prospective voters, and, so, that the three-day restriction that our current SGA has in its regulations, in my judgment at the time I made that, that seemed to be a bit unreasonable.
 
 
 65
 Q. In an article that I believe was published the thirtieth of January of 1985 in The Crimson White, you made the statement, "Without the support of a political faction you've got to have more than three days to win on a campus of fifteen thousand."
 
 
 66
 Do you remember making that statement?
 
 
 67
 A. Yes, I do.
 
 
 68
 Q. Why do you believe that, other than what you've just stated, that that is true, without the support of a political faction? What difference does a political faction make?
 
 
 69
 ....
 
 
 70
 A. I think I answered that previously; it is just getting around.
 
 
 71
 (emphasis added). The record is clear: the University has never maintained "that a time limitation on electioneering ... serves the [University's] interest of trying to contain the amount of [student] energy that is spent in such activities and diverted from other more important activities, including that of scholarship and study," as the district court concluded. Instead, the University's interest in the SGA is limited to ensuring that the organization provides an experience by which students can understand the practical workings of government. In my view, our striking the challenged SGA regulations would not interfere with that educational mission. Indeed, such action would enhance the students' learning experience, teaching them a basic lesson about our political system: that a government may not abridge the free speech of its constituents absent a compelling interest.
 
 C.
 
 72
 Even were I to assume that some "educational mission" underlies the SGA regulations, my position would be the same. I recognize that the educational interests of a university could justify regulation of the student government process. See, e.g., Sellman v. Baruch College, 482 F.Supp. 475 (S.D.N.Y.1979) (Candidates for student government must maintain a minimum academic courseload and grade point average.). The proper application of the constitutional standard prescribed in Perry, however, would prevent us from upholding the SGA regulations at issue in this case.
 
 
 73
 First, I would note that the district court focused solely on the regulations' effect on the University's campus, as if it were the only property subject to the restrictions. The SGA regulations, however, are not confined to expressive activity on campus: they govern all SGA campaign activity, whether on or off campus. Thus, campaign literature cannot be distributed on the streets and sidewalks of Tuscaloosa, nor in its parks--areas that are certainly public fora--until three days before the election. Because the regulations control expressive activity in these public fora, they are subject to the constitutional standard applicable to such fora: the "compelling state interest" test. A university's interest in furthering its educational mission, if reasonable in scope, may be a "compelling state interest." See Widmar v. Vincent, 454 U.S. 263, 267 n. 5, 277, 102 S.Ct. 269, 273 n. 5, 278, 70 L.Ed.2d 440 (1981). The sweeping range of the election restrictions, however, prevents any conclusion that the SGA regulations are "reasonable in scope."Second, with regard to the effect of the SGA regulations on the campus, I would note that the district court determined that the campus fell within the "limited public forum" category of government property. I would agree. I conclude, however, that the district court erred in its application of the constitutional standard governing this type of forum.
 
 
 74
 The district court treated the campus as if the University had generally created a public forum, but in creating this forum had reserved the right to limit speech associated with SGA elections. In Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269 (1981), the Supreme Court was faced with a situation somewhat similar to the one that confronted the district court in this case. In Widmar, the University of Missouri at Kansas City (UMKC) opened its meeting facilities for general student use, no matter what the topic of discussion. Thereafter, UMKC closed those facilities for one topic of discussion--religion--believing that the first amendment's establishment clause required it to do so.
 
 
 75
 In response to UMKC's action, members of one of its student religious organizations sought an injunction prohibiting further enforcement of the restriction, contending that the restriction violated their constitutional rights to equal protection, free exercise of religion, and freedom of speech. The district court upheld the restriction, granted UMKC summary judgment, see Chess v. Widmar, 480 F.Supp. 907 (W.D.Mo.1979), and the students appealed. The court of appeals held that the restriction violated the free exercise and free speech clauses of the first amendment, and reversed the district court. See Chess v. Widmar, 635 F.2d 1310 (8th Cir.1980). The Supreme Court, on certiorari, affirmed the court of appeals' decision. See Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).
 
 
 76
 The Supreme Court observed, as a threshold matter, that contrary to UMKC's belief, the first amendment establishment clause did not preclude it from permitting religious discussion in its meeting facilities. See id. at 270-75, 102 S.Ct. at 275-77. Noting that UMKC had a policy of making its meeting facilities generally available to its students without regard to the topic of discussion, the Court then held that those facilities were a public forum, limited to student use. See id. at 267, 102 S.Ct. at 273. The ban on religious discussion thus constituted a content-based restriction on speech in a limited public forum. Because UMKC had not shown a "compelling state interest" justifying the restriction, the Court declared the restriction unconstitutional.[5]
 
 
 77
 Implicit in Widmar 's holding is that once a state university opens its campus as a limited public forum for student speech, the university cannot eliminate a topic of speech merely by stating that it is placing a "limitation" on the forum. If a university could do so, the result in Widmar would have been different. The Court would have treated UMKC's ban on religious speech as a limitation on a created public forum--i.e., the UMKC campus would not have been a public forum for religious discussion--and, accordingly, would have used a standard of "reasonableness" to test the restriction. By using the "compelling state interest" test, however, the Court tacitly rejected this approach and held that UMKC's content-based restriction could not be justified as a mere limitation on a campus forum.
 
 
 78
 In the case before us, the district court adopted the approach implicitly rejected in Widmar. The parties do not dispute that the University is making its campus generally available for student debate, limiting only one topic of discussion: political speech regarding SGA elections. Widmar mandates that the validity of this action be assessed under the "compelling state interest" test. Applying this test to the instant case, I can perceive no "educational mission" that would compel the implementation of the broad regulations adopted by the SGA. I would hold that the district court erred in so concluding.[6]
 
 III.
 
 79
 The district court should have declared the challenged campaign regulations unconstitutional, as an infringement of appellants' right of free speech. The University of Alabama has not attempted to justify an educational purpose for the regulations--indeed, the University has indicated that it finds the regulations overly restrictive of its students' right to freedom of speech. Moreover, even if the University had maintained that the regulations were necessary for the pursuit of its "educational mission," I would find them overbroad. I therefore respectfully dissent.
 
 
 
 *
 Honorable Maurice M. Paul, U.S. District Judge for the Northern District of Florida, sitting by designation
 
 
 [1]
 The SGA is financed through a mandatory student activity fee levied by the University on all students
 
 
 [2]
 The appellants do not challenge the constitutionality of these general time, place, or manner restrictions
 
 
 [3]
 In their answers to the complaint, the SGA and the University denied the material allegations of the complaint and asserted, as an affirmative defense, that the eleventh amendment to the United States Constitution barred appellants' suit. The district court struck this affirmative defense as legally insufficient, and appellees do not question the court's ruling here
 
 
 [4]
 In their brief, appellees urge us to uphold the district court's decision on the ground that the SGA regulations are not content-based because they apply to all SGA candidates. This argument is without merit: if a restriction on speech singles out one subject for regulation, the restriction is content-based. See Boos v. Barry, 485 U.S. 312, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988); Consolidated Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 537-38, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980); Carey v. Brown, 447 U.S. 455, 462 & n. 6, 100 S.Ct. 2286, 2291 & n. 6, 65 L.Ed.2d 263 (1980)
 
 
 [5]
 The Court, however, noted that a state has slightly more authority to regulate speech on campus than to regulate speech in a public forum located off campus:
 This Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum....
 At the same time, however, our cases have recognized that First Amendment rights must be analyzed "in light of the special characteristics of the school environment." We continue to adhere to that view. A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities.
 Widmar, 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5 (citations omitted); see id. at 277, 102 S.Ct. at 278 (recognizing "a University's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education").
 
 
 [6]
 I would not hold that, with respect to the students, the entire University campus is a public forum, in which all restrictions on student speech must be tested under the "compelling state interest" standard. A campus of a major state university is a microcosm of the community, and, as such, contains a variety of fora. Some places on campus, such as the administration building or the president's office, are not opened as fora for use by the student body, and may be best described as nonpublic fora. Other places on campus, such as the residence halls and fraternity and sorority houses, have been created to allow student expression, but remain limited for use by certain groups or for the discussion of certain subjects; these places may be best described as limited public fora. Other places on campus, such as the campus student union, streets, sidewalks, and park-like areas, are freely used for student expression. These areas are best described as traditional public fora, in which a university's ability to regulate speech is most circumscribed. Whether a university regulation restricts student speech in a part of its campus that is a public forum depends on the facts of each case. I simply note that in the present case, because the SGA regulations apply to all parts of the campus, the regulations restrict speech in parts of the campus which are, with respect to the students, public fora