**David V. WELKER, et al., Plaintiffs,**

v.

**Ralph J. CICERONE, et al., Defendants**

**No. EDCV 01–815 RTSGLX.**

United States District Court, C.D. California, Eastern Division.

Nov. 27, 2001.

James Bopp, Jr., Raeanna S. Moore, James Madison Center for Free Speech, Bopp, Coleson & Bostrom, Terre Haute, IN, John C. Eastman, Orange, CA, for Plaintiffs.

James E. Holst, John F. Lundberg, Jeffrey A. Blair, University of California, Office of General Counsel, Oakland, CA, for Defendants.

## ORDER GRANTING PLAINTIFF DAVID V. WELKER'S MOTION FOR PRELIMINARY INJUNCTION

TIMLIN, District Judge.

The court, Judge Robert J. Timlin, has read and considered Plaintiffs David Welker ("Welker"), Ian McGrew ("McGrew"), and Nathan Masters ("Masters") (collectively, "Plaintiffs")'s Motion ("Motion") for a preliminary injunction against Defendants Ralph Cicerone ("Cicerone"), Charles Pieper, Katherine Goshgarian, Walter Coronell, Shervin Bozorgnia, Paris

Shahabi, and Tracy De la Cruz (collectively, "Defendants") and Defendants' opposition.[1] Based on such consideration, the court concludes as follows:

## I.

### BACKGROUND [2]

**A. Associated Students of the University of California, Irvine Elections Code**

■ The University of California consists of several campuses throughout the state of California, including the University of California at Irvine ("UCI"). The Associated Students of the University of California, Irvine ("ASUCI") is a student organization comprised of all 15,970 UCI students.

According to the Preamble to its constitution, ASUCI was established and exists to (a) provide a forum for the expression of views and interests of UCI students, (b) encourage and maintain the freedom of UCI students to pursue knowledge, (c) encourage student academic rights and responsibilities, (d) represent and articulate the rights of UCI students to have a voice in campus government, and (e) foster recognition of the rights of UCI students. The governing body of ASUCI, including its Legislative Council, Executive Cabinet, and Judicial Board, is charged with carrying out these constitutional mandates. Every enrolled ASUCI student maintaining a minimum grade point average of 2.0 on a 4.0 scale, among other requirements, may campaign for any elected office in ASUCI, and every registered undergraduate UCI student may vote for ASUCI officers.

Students elected to Legislative Council serve one-year terms, with one-half being elected in the spring quarter and one-half being elected in the fall quarter. Students elected to the Executive Cabinet serve one-year terms and are elected in the spring quarter. Judicial Board members are appointed to two-year terms by the Executive Cabinet.

Pursuant to the ASUCI constitution, the ASUCI Legislative Council enacted the ASUCI Elections Code ("Elections Code"), which was subsequently approved by UCI Chancellor Cicerone. In spring 2001, Article XVII, § E of the Elections Code provided: "No candidate for ASUCI Legislative Council may spend more than one hundred dollars ($100) on his/her campaign." [3]

A finding by the ASUCI Elections Commission, which consists of the ASUCI Executive Vice President, ASUCI Elections Commissioner, and three Deputy Elections Commissioners, all students, that an ASU-

---

1. Plaintiffs filed their Supplemental Memorandum of Points and Authorities in support of the Motion for Preliminary Injunction one day after the date set by the court in its Order denying Plaintiffs' Motion for a temporary restraining order. However, the court will consider their Supplemental Memorandum.

2. The following background is taken from Plaintiffs' Amended Verified Complaint and their Motion, as well as from Defendants' opposition, along with all supporting documents. The court notes that because of the urgency involved and the limited time that a preliminary injunction remains in effect, declarations and evidence supporting the Motion need not conform to the standards for a summary judgment motion or to the Federal Rules of Evidence. *See Flynt Distrib. Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984); *Bracco v. Lackner,* 462 F.Supp. 436, 442 n. 3 (N.D.Cal.1978). It is up to the trial court to determine the weight to be given such evidence, taking into consideration the declarant's competency, personal knowledge, and credibility. *See Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.,* 762 F.2d 1374, 1377 (9th Cir.1985); *Bracco,* 462 F.Supp. at 442 n. 3.

3. This expenditure limitation has since increased to $200. *See* Article XVII, § E. The court will refer to the $100 expenditure limitation as "former Article XVII, § E."

CI candidate violated any provision of the Elections Code will result in that candidate's immediate disqualification from the elected position she was attempting to obtain. Such a finding can be appealed to the Judicial Board, which will issue a final, non-appealable ruling.

### B. Welker

Welker is a senior at UCI who campaigned for a seat on the Legislative Council in the spring 2001 election. Running unopposed, he spent $233.40 on campaign posters made by Kinko's, a corporation that specializes in photocopying and design layout. He was elected to a seat on the Legislative Council, but was disqualified from holding this position after the Elections Commission determined Welker violated former Article XVII, Section E.

Welker appealed his disqualification to the Judicial Board, which upheld the Elections Commission's action. He subsequently contacted UCI's Dean of Students, Sally Peterson, to inquire whether he could appeal the Judicial Board's decision to the University. In Dean Peterson's office, and later via e-mail, Dean Peterson informed Welker that "I do not see that an appeal would be granted." Welker's seat was subsequently filled by another student, and Welker has not been reinstated to his seat on the Legislative Council.

## II.

### *ANALYSIS*

### A. Mootness

Plaintiffs originally challenged numerous provisions of the Elections Code that were operational when Plaintiffs filed their Complaint. However, the Elections Code changed between the time Plaintiffs filed their Complaint and Defendants filed their opposition. Therefore, in an Order filed November 1, 2001, this court denied Plaintiffs' Motion for a temporary restraining order on the grounds that their claims were moot.

■ Constitutional and prudential concerns limit the federal judicial power. "While standing is concerned with who is a proper party to litigate a particular matter, ripeness and mootness determine when that litigation may occur." Erwin Chemerinsky, Federal Jurisdiction § 2.4.1 (3d ed.1999). A federal court has no authority to issue opinions upon moot questions. *See Church of Scientology of California v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992).

■ "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Northwest Envtl. Def. Ctr. v. Gordon,* 849 F.2d 1241, 1244 (9th Cir.1988) (citing *United States v. Geophysical Corp. of Alaska,* 732 F.2d 693, 698 (9th Cir. 1984)). "A case becomes moot whenever it los[es] its character as a present, live controversy of the kind that must exist if [courts] are to avoid advisory opinions on abstract propositions of law." *West v. Sec'y of Dep't of Transp.,* 206 F.3d 920, 924 (9th Cir.2000) (quoting *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)); *see also City of Erie v. Pap's A.M.,* 529 U.S. 277, 287, 120 S.Ct. 1382, 1390, 146 L.Ed.2d 265 (2000) (stating that unless plaintiff can obtain effective relief, any opinion as to the legality of the challenged action would be advisory, in violation of Article III of the United States Constitution). "Essentially, any change in the facts that ends the controversy renders the case moot." Chemerinsky, at § 2.5.1.

■ Plaintiffs concede that McGrew's and Masters' Motion for a preliminary injunction is moot, as the Elections Code provisions they challenged in the original Complaint and Motion are no longer en-

forceable and did not injure McGrew and Masters. However, Welker suffered a direct injury from the enforcement of former Article XVII, § E and continues to suffer collateral negative consequences from Defendants' enforcement of former Article XVII, § E against him.[4] Welker was disqualified from representing his constituents in the Legislative Council due to Defendants' enforcement of the $100 expenditure limit, and he continues to be harmed by their enforcement, as he has not been reinstated to his seat on the Council. Thus, Welker's challenge to the constitutionality of former Article XVII, § E is not moot, and he has standing to posit it as the basis for his Motion.

## B. Eleventh Amendment

■■■ Defendants contend the Eleventh Amendment[5] bars Plaintiffs' claim. The Eleventh Amendment functions to immunize a nonconsenting state from suits brought against it in federal courts by her own citizens as well as by citizens of another state. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Yakama*

*Indian Nation v. State of Washington Dep't of Revenue*, 176 F.3d 1241, 1245 (9th Cir.1999) ("The Eleventh Amendment bars suits against a state or its agencies, regardless of the relief sought, unless the state unequivocally consents to a waiver of its immunity."). "The state's consent must be 'unequivocally expressed,' meaning that the consent is effective 'only where stated by the most express language.'" *Yakama*, 176 F.3d at 1245 (quoting *Pennhurst*, 465 U.S. at 99, 104 S.Ct. at 907; *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305, 110 S.Ct. 1868, 1873, 109 L.Ed.2d 264 (1990)) (internal citations omitted). Moreover, 42 U.S.C. § 1983 ("Section 1983") does not necessarily abrogate Eleventh Amendment immunity. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 169 n. 17, 105 S.Ct. 3099, 3107 n. 17, 87 L.Ed.2d 114 (1985); *Quern v. Jordan*, 440 U.S. 332, 344–45, 99 S.Ct. 1139, 1147, 59 L.Ed.2d 358 (1979).

■■■ The Eleventh Amendment generally applies equally to all state officials acting in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, and n. 10, 109 S.Ct. 2304, 2312, and

---

4. The only section of the Elections Code Welker challenges is the $100 expenditure limit. *See* Amended Verified Complaint, at pp. 15–20. The court recognizes that in the First Amended Complaint McGrew alleges that Article XVII § E and Article XVIII § C of the Elections Code, as amended in late October 2001, both facially and as applied, violate his First Amendment rights; and Masters alleges that Article XVII § F and Article XVIII § B of the Elections Code, as amended in late October 2001, both facially and as applied, violate his First Amendment rights. However, the Motion for preliminary injunction before the court was filed before the amendments were codified and prior to the filing of the First Amended Complaint. Consequently, as conceded by Plaintiffs in their Supplemental Memorandum of Points and Authorities at pages 1 and 2, only Welker's constitutional challenge to the $100 spending limitation is not moot.

5. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." "Although the Amendment, by its terms, 'would appear to restrict only the Article III diversity jurisdiction of the federal courts,' *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996), the Court has interpreted the Amendment more broadly." *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 501, 118 S.Ct. 1464, 1470, 140 L.Ed.2d 626 (1998). It also applies to actions filed in federal court based on federal question jurisdiction. *See Alden v. Maine*, 527 U.S. 706, 727–28, 119 S.Ct. 2240, 2253, 144 L.Ed.2d 636 (1999) (citing *Hans v. Louisiana*, 134 U.S. 1, 10, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890)).

n. 10, 105 L.Ed.2d 45 (1989); *Mitchell v. Los Angeles Comm. Coll. Dist.*, 861 F.2d 198, 201–02 (9th Cir.1988) ("Such suits are, in essence, actions against the governmental entity of which the officer is the agent."). Defendants, state officials sued in their official capacity, are thus generally immune from suit, as "California has not waived its Eleventh Amendment immunity with respect to claims brought under § 1983 in federal court." *Dittman v. California*, 191 F.3d 1020, 1025–26 (9th Cir. 1999) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 3146–47, 87 L.Ed.2d 171 (1985)).

 However, the Eleventh Amendment provides no shield for state officials acting in their official capacities when plaintiffs request prospective injunctive relief. *See, e.g., Doe v. Lawrence Livermore Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir.1997). The question here is whether Plaintiffs seek prospective injunctive relief.

Defendants contend that Plaintiffs request only retrospective relief. They cite Plaintiffs' Supplemental Memorandum of Points and Authorities, which claims that "Welker ... is not seeking prospective relief." However, it is difficult to reconcile this statement with Plaintiffs' further statement:

> Rather, he has asked the Court to find the statutes unconstitutional and order the defendants to reinstate him to the position he lost as a result of the defendants [sic] enforcement of the unconstitutional regulation and to order defendants to expunge the disqualification from his record since such disqualification from office is a form of campus discipline which is recorded in his student record.

Welker's requested relief, including reinstatement to his seat on the Legislative Council and expungement of an incident from his disciplinary record, is prospective injunctive relief. *See, e.g., Doe*, 131 F.3d at 839–42 (request for reinstatement is prospective injunctive relief); *U.S. ex rel. McVey v. Bd. of Regents of Univ. of California*, 165 F.Supp.2d 1052, 1057 (N.D.Cal. 2001) ("[R]einstatement is a legitimate request for prospective injunctive relief."). Therefore, Plaintiffs' suit is not barred by the Eleventh Amendment.

**C. Legal Standard Regarding Issuance of Preliminary Injunction**

 The court has inherent authority to grant preliminary injunctive relief in the exercise of its equitable powers. *See In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1476 (9th Cir.1994). A party seeking a preliminary injunction must satisfy the same requirements that must be satisfied by a party seeking a temporary restraining order. *See Bronco Wine Co. v. United States Dep't of Treasury*, 997 F.Supp. 1309, 1313 (E.D.Cal.1996). "To obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [the movant's] favor." *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990). "These are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988) (quoting *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987)) (quoting in turn *San Diego Comm. Against Registration and the Draft (Card) v. Governing Bd. of the Grossmont Union High Sch. Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986), *abg'd on other grounds recg'd by Eclipse Assoc., Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n. 1 (9th Cir.1990)). However, to

issue a preliminary injunction in any situation, the court must find that there is at least a fair chance of success on the merits, *see Johnson v. California State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir. 1995), and that there is some threat of an immediate irreparable injury, *see Big Country Foods, Inc., v. Bd. of Ed. of the Anchorage Sch. Dist.,* 868 F.2d 1085, 1088 (9th Cir.1989). Moreover, in actions "where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992).

1. *Likelihood of Success on the Merits*

a. Standard To Apply To Review Of Candidate Expenditure Limit In State University Political Campaign

■ The parties disagree on a fundamental issue: what is the standard a court should employ to review the constitutionality of an expenditure limit in a public college's or university's election code? Plaintiffs argue that the expenditure limit is a content-based regulation of student speech and that a forum-based analysis is appropriate. They further contend that the UCI campus is a limited public forum and that the expenditure limit, being content-based, is not narrowly drawn to effectuate a compelling state interest. Defendants, on the other hand, argue that the court should subject the expenditure limit to a reasonableness standard of scrutiny and that former Article XVII, § E of the Elections Code is reasonable.

Plaintiffs' argument for a forum-based analysis is unsupportable. They have not cited any case law utilizing a forum-based analysis in a situation with facts similar to those at bar. They rely exclusively on the dissenting opinion of a twelve-year-old Eleventh Circuit case, *Alabama Student Party v. Student Gov't Ass'n of the Univ. of Alabama,* 867 F.2d 1344 (11th Cir.1989) (Tjoflat, J., dissenting), which opined that a forum-based analysis is proper when reviewing a challenge to the constitutionality of a university election code. *See id.* at 1349 (stating that "[i]t is well settled that a state's ability to restrict speech that occurs on government property depends on the nature of the forum created by the property involved").

The majority opinion in *Alabama Student* explicitly rejected invoking a forum-based analysis. It concluded that such an analysis "would more properly apply if the [Student Government Association of the University of Alabama] was seeking access to the University campus for its elections. But that is not the case here." *Id.* at 1345. This court similarly refrains from adopting the view of this lone dissent and applying it to the facts of this case.

However, the court is equally dubious about applying the reasoning of the *Alabama Student* majority opinion to the present situation. *Alabama Student* involved a challenge to various provisions of the University of Alabama's student government elections code. *See id.* Specifically at issue were restrictions on the distribution of campaign literature and limitations on official candidate debates. *See id.* The *Alabama Student* court confronted regulations concerning physical activities on campus. The court therefore adopted the reasonableness test, granting deference to the state educational institution because it had a "right ... to make academic judgments as to how best to allocate scarce resources." *Id.* (quoting *Widmar v. Vincent,* 454 U.S. 263, 276, 102 S.Ct. 269, 278, 70 L.Ed.2d 440 (1981)).

Unlike in *Alabama Student,* the provision at issue here is a student candidate expenditure limit that, in its application, does not directly or indirectly affect UCI's "scarce resources." There is accordingly

less reason to defer to the judgment of UCI than the University of Alabama. *Alabama Student*'s analysis is inapposite here, where the activity in dispute is a student candidate expenditure limit. A campaign expenditure limit does not relate to where a student candidate can speak or what specifically she or he can say. Rather, as developed below, a campaign expenditure limit implicates the quantity and diversity of speech.

The court looks to *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), being the seminal "campaign finance" case, as its basis for analysis. The *Buckley* plaintiffs claimed that certain provisions of the Federal Election Campaign Act of 1971 and related sections of the Internal Revenue Code of 1954, both as amended in 1974, violated their First Amendment rights. *See id.* at 6, 13–14, 96 S.Ct. at 629, 632. Among such provisions was a limitation regarding the total amount of money that a candidate for federal office could spend on her campaign. *See id.* at 13–14, 96 S.Ct. at 632.

*Buckley* unequivocally found that spending money in a political campaign directly affects freedom of speech. *See, e.g., Fed. Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 121 S.Ct. 2351, 2358, 150 L.Ed.2d 461 (2001) (citing *Buckley* for the proposition that "[s]pending for political ends ... fall[s] within the First Amendment's protection of speech."). The Court began by noting that "expenditure limitations operate in an area of the most fundamental First Amendment activities.... The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley*, 424 U.S. at 14, 96 S.Ct. at 632 (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). It then concluded that a "restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of the exploration, and the size of the audience reached." *Id.* at 19, 96 S.Ct. at 634 (analogizing that "[b]eing free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline"). In contrast to its treatment of contribution limitations, the Court held that campaign expenditure restrictions must satisfy "exacting scrutiny." *Id.* at 39, 44–45, 96 S.Ct. at 644–45, 646–47; *see also Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 386, 120 S.Ct. 897, 903, 145 L.Ed.2d 886 (2000) (quoting *Buckley*). Thus, defendants must demonstrate that their campaign expenditure restrictions serve a compelling interest and that they are narrowly tailored to effectuate the interest. *See Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 701, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990); *see also id.* at 701, 110 S.Ct. at 1419 (Kennedy, J., dissenting) ("Restrictions on ... expenditures are unconstitutional if they fail to meet both of these standards."); *Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 251–52, 107 S.Ct. 616, 624–25, 93 L.Ed.2d 539 (1986) (citing *Buckley*).

■ While *Buckley* involved federal campaign regulations, it has been applied equally to state political elections. *See Nixon*, 528 U.S. at 385–97, 120 S.Ct. at 903–10; *see also Suster v. Marshall*, 149 F.3d 523, 528 n. 3 (6th Cir.1998) (rejecting defendants' argument that *Buckley* standard should not apply to expenditure limit in state election). Here, the UCI elections code governs student elections at a state

university. The court sees no reason to distinguish between applying *Buckley* to state political elections and political elections at state universities.[6] Thus, *Buckley*'s strict scrutiny is the proper standard to apply to the expenditure restriction at bar.

### b. Compelling Interest

■ Defendants propose four interests in maintaining and enforcing the expenditure restriction. First, the restriction ensures that students of all socio-economic backgrounds can participate equally in the process of UCI's student government. Moreover, it discourages candidates from soliciting monetary donations during time periods when they would otherwise engage in academic pursuits (e.g., attend class). Further, it decreases the risk that candidates would be influenced by private corporate sponsors. Finally, it fosters candidates' creativity.

### 1. Increase socio-economic equality

■ The *Buckley* Court squarely confronted Defendants' first interest, finding that it falls short of a compelling interest. The Court stated:

It is argued ... that the ancillary governmental interest in equalizing the relative ability of individuals ... to influ-

ence the outcome of elections serves to justify the limitation .... But the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment .... The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion.

424 U.S. at 48–49, 96 S.Ct. at 649. *Buckley* thus stands for the proposition that the "desire to equalize the financial resources available to candidates does not justify the [campaign finance] limitation." *See, e.g., First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 809, 98 S.Ct. 1407, 1433, 55 L.Ed.2d 707 (1978) (White, J., dissenting). While the implications of such a socio-economic consideration not being a factor in the strict scrutiny analysis gives the court pause, Plaintiffs have cited no authority-and the court has found none-that would distinguish *Buckley*'s rejection of this factor.

### 2. Encourage academic pursuits

Assuming *arguendo* that Defendants have a compelling interest in restricting campaign expenditures in order to further

---

**6.** The court is mindful of the generally relaxed First Amendment standard applicable to the college and university setting. *See, e.g., Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988); *Widmar v. Vincent*, 454 U.S. 263, 277, 102 S.Ct. 269, 278, 70 L.Ed.2d 440 (1981) (discussing a "university's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education"). However, an inquiry into the purpose of such deference reveals that relaxed First Amendment protection is unwarranted in the present situation.

*Hazelwood*, for example, concerns the narrow issue of the constitutionality of schools regulating expression connected with official curricular activities. *See id.* In general, deference to school administrators regarding alleged free speech restrictions is usually justified by a court's unwillingness to dictate "how best to allocate scarce resources," *Alabama Student*, 867 F.2d at 1345 (quoting *Widmar*, 454 U.S. at 276, 102 S.Ct. at 278), or to intrude on administrators' areas of expertise. Such concerns are inapposite in the case at bar. While a student election can certainly further the educational mission of a school, an expenditure restriction does not implicate an institution's "scarce resources," relate to the school's curriculum, or tread on administrators' areas of expertise.

candidates' academic pursuits, the expenditure limit is not narrowly tailored to this interest. As Plaintiffs aptly point out, students who run for Legislative Council are required to maintain a minimum grade point average to maintain their eligibility as candidates. Thus, there is already in place a requirement to ensure candidates focus on their academics. Moreover, Defendants' contention that imposing expenditure limits increases candidates' needs to campaign creatively cuts against their argument that expenditure limits are necessary to further students' academic pursuits; managing a creative campaign can be at least as time-consuming as soliciting monetary donations. The $100 expenditure restriction is not related in any substantial sense to encouraging students' academic pursuits.

### 3. Decrease influence by private corporate sponsors

Defendants' interest in decreasing the influence exerted by private corporate sponsors suffers from the same deficiency as Defendants' interest in encouraging candidates' academic pursuits: even assuming *arguendo* that curtailing such influence is a compelling interest, it is not narrowly tailored to effectuate this interest.

There are two flaws in Defendants' argument. First, when the former $100 expenditure limit was applicable, a candidate for Legislative Council could not have accepted more than $50 in donations, no more than $25 of which could have been received from any one source. *See* former Article XVIII, § E. The $25 and $50 donation restrictions served to prevent potential corporate influence. The $200 limit, therefore, was irrelevant for mitigating undue influence by corporate sponsors.

Second, even without former Article XVIII, § E, corporations could have curried as much favor with candidates with the expenditure limit in place as they could

have in its absence. Private sponsors could have always, of course, donated campaign materials, food, utility services, telephone services, office space, etc., to candidates. They could have also endorsed a specific candidate. Companies providing such non-monetary donations, potentially just as valuable as money itself, could have influenced a candidate to the same extent as companies donating money. Therefore, the $100 expenditure restriction will not stem the potential of undue corporate influence over candidates.

### 4. Increase candidates' creativity

"If UCI did not have reasonable limits on spending," Defendants argue, "students would not have to think creatively about campaigning." Again, the court need not discuss whether Defendants' interest in advancing candidates' creativity is a compelling interest, as the expenditure limitation is not narrowly tailored to this interest. The court fails to grasp the direct correlation between expenditure limits and candidates' creativity. There is no reason to believe that the ability to raise and spend more than $100 would thwart candidates' creativity. In fact, the potential to spend more than $100 on a campaign likely opens up channels of communication that might not otherwise be available to candidates who are limited to spending $100. Thus, the expenditure restriction has the potential to stifle, not to foster, candidates' creativity.

### 2. *Irreparable Injury*

■■■■■ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) (plurality). *See also Am.-Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1058 (9th Cir.1995) (quoting *Elrod* ). Having found that Welker has

proved a likelihood of success on the merits of his First Amendment claim regarding the campaign expenditure limitation, irreparable injury is presumed. *See Elrod,* 427 U.S. at 373, 96 S.Ct. at 2689; *Am. for Med. Rights v. Heller,* 2 F.Supp.2d 1307, 1316 (D.Nev.1998).

 Defendants contend, however, that Welker's injury lacks the need for immediate remediation. They point out that he waited seven months prior to filing his claim and that, since he ran unopposed for Legislative Council, he spent more than $100 merely to challenge the constitutionality of the expenditure provision. However, Defendants have cited no judicial precedent supporting the proposition that a plaintiff's motivation for filing a lawsuit or strategic decision to file the lawsuit at a particular time is relevant for irreparable harm analysis. Moreover, the immediacy of the situation is apparent from the record, which indicates that each passing day marks time that Welker is prohibited from representing his constituents on the Legislative Council.

### 3. *Public Interest*

As political representation is in the public interest, the court must be satisfied that the public interest favors granting Plaintiffs' Motion. Vindicating First Amendment rights is surely in the public interest. *See, e.g., Monterey County Democratic Cent. Comm. v. U.S. Postal Serv.,* 812 F.2d 1194, 1196 (9th Cir.1987) ("The values embodied in the First Amendment ... constitut[e] the hallmark of free societies."). Moreover, ensuring that a duly elected official has the opportunity to represent her constituents is unquestionably in the public interest. *See, e.g., Bush v. Gore,* 531 U.S. 98, 135, 121 S.Ct. 525, 546, 148 L.Ed.2d 388 (2000) (Souter, J., dissenting). Therefore, granting Plaintiffs' Motion is in the public interest.

### III.

### *DISPOSITION*

ACCORDINGLY, IT IS ORDERED THAT:

1) Plaintiffs' Motion be GRANTED;

2) That a preliminary injunction issue ordering Defendants to restore Welker to his position on the ASUCI Legislative Council and to expunge the disqualification from Welker's student record;

3) Welker give security in the amount of five thousand (5,000) dollars pursuant to Federal Rules of Civil Procedure, Rule 65(c); and

4) Welker shall submit to the court a proposed preliminary injunction consistent with this Order.