Aaron FLINT, Plaintiff,

v.

George DENNISON, in his official capacity as President of the University of Montana, et al., Defendants.

No. CV 04–85–M–DWM.

United States District Court, D. Montana, Missoula Division.

Aug. 20, 2004.

read January 1, 2001.

James Bopp, Jr., Jeffrey Gallant, Bopp, Coleson & Bostrom, Terre Haute, IN, Bridgitt Erickson, Attorney at Law, Lincoln, MT, for Plaintiff.

LeRoy H. Schramm, Montana University System, Helena, MT, David J. Aronofsky, Legal Counsel, Missoula, MT, for Defendant.

## ORDER

MOLLOY, District Judge.

### I.  Introduction

Plaintiff Aaron Flint brings this action challenging campaign finance regulations imposed by the Associated Students of the University of Montana ("ASUM").  The ASUM bylaws restrict a senatorial candidate's spending to $100.00 per election. Flint exceeded the spending limits result-

ing in an ASUM senate resolution preventing him from assuming the seat to which he was otherwise elected. Flint then filed this action against the president of the University, ASUM and its individual members (collectively referred to hereinafter as "ASUM") contending that the spending cap violates his First Amendment free speech rights and seeking injunctive relief. Following the denial of his motion for a temporary restraining order, Flint moved for a preliminary injunction requiring ASUM to allow him to take his seat in the senate in the fall of 2004.

## II. Factual Background

ASUM has employed campaign finance restrictions since 1970. The expenditure caps were enacted to ensure that all students enjoyed equal access to the educational benefits available through ASUM participation. It is ASUM's belief that absent spending restrictions, wealthy students will crowd out others in the competition for limited seats by purchasing increased visibility and name recognition. ASUM attempts to make its educational opportunities available to all students by imposing spending caps (currently set at $100.00 for all offices) and reimbursing candidates for one half of their expenditures up to $45.00. Thus, in a campaign for which a student spends up to the $100.00 limit, only $55.00 will come from the student's own resources.

At the time of the filing of this action, Plaintiff Aaron Flint was the President of ASUM. He was elected to that position, among other things, by violating ASUM's campaign spending bylaws during the 2003 elections. Campaign spending was limited in the 2003 elections to $175.00 for a president and vice president candidate team. Flint and his running mate, current ASUM president-elect Gail Price, spent roughly $300.00 on their campaign. For this they were censured during the 2003–04 academic year, while Flint was president of

ASUM. Following that censure, Flint ran for a post in the ASUM senate and was again elected. Once again he violated the spending rules, spending $214.69 despite the expenditure limit of $100.00, and it is probably a fair assumption that he did so on purpose. Flint disclosed his second campaign finance violation on April 26, 2004, the day before the polls opened. The ASUM senate met on April 28, 2004 and, pursuant to § 5 of Article V of the ASUM bylaws, voted to deny Flint his seat should be elected. Flint responded by filing this action.

## III. Analysis

■ Flint seeks a preliminary injunction enjoining the enforcement of ASUM's spending limits and reinstating him as a senator or, in the alternative, requiring that his seat remain unfilled pending a final determination by this Court. "To obtain a preliminary injunction, the moving party must show (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor." *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998). As the probability of success on the merits decreases, the required degree of irreparable harm increases. *Id.*

■ Flint's likelihood of success on the merits depends primarily on the degree of scrutiny with which the Court assesses the constitutionality of ASUM's spending limits. Flint urges the Court to follow the reasoning employed by the United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and apply strict scrutiny to the spending caps as a potential violation of students' free speech rights. ASUM argues for a deferential standard of review that takes into account the University's special need to control the academic environment. I

find that the deferential standard applies in this case.

■ The United States Supreme Court has long acknowledged the right of state universities to ensure the quality and availability of educational opportunities, even where the exercise of that right results in the exclusion of First Amendment activities. *Widmar v. Vincent,* 454 U.S. 263, 277, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). "The First Amendment right of students in the public schools 'are not automatically coextensive with the rights of adults in other settings.' " *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Bethel School District No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)). Rather, those rights must be considered in "light of the special characteristics of the school environment." *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

In *Bethel,* the Court found no First Amendment violation where school officials disciplined a high school student for using vulgar language during a school assembly, and in so doing stated explicitly that the acceptable restrictions on adult speech in the general public are fewer than those that may be imposed on student speech in the school setting. 478 U.S. at 682–85, 106 S.Ct. 3159. In *Hazelwood,* school officials removed stories on controversial topics from the school paper. The Court upheld the action against a First Amendment challenge, holding that schools may impose limits on school-related speech "so long as their actions are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. 562. The Supreme Court in *Tinker* upheld the right of students to protest the Vietnam war by wearing black armbands, and in so doing signaled that the governing standard for First Amend-

ment challenges in school cases is one of reasonableness. The Court read the Constitution to "permit reasonable regulation of speech connected activities in carefully restricted circumstances," 393 U.S. at 513, 89 S.Ct. 733, and noted that the school officials' fear that the protest would be disruptive was unreasonable. *Id.* at 514, 89 S.Ct. 733.

Flint argues against the use of a reasonableness standard and instead asks the Court to impose the exacting scrutiny the Supreme Court applied to campaign spending restrictions in *Buckley.* Flint relies heavily on *Welker v. Cicerone,* 174 F.Supp.2d 1055 (C.D.Cal.2001), in which a federal district court assessing the constitutionality of a similar university student government campaign spending limit looked to *Buckley* as its basis for analysis. The *Welker* court noted that *Buckley* was unequivocal in finding that "spending money in a political campaign directly affects freedom of speech," thereby requiring the university to "demonstrate that their campaign expenditure restrictions serve a compelling interest and that they are narrowly tailored to effectuate the interest." *Welker,* 174 F.Supp.2d at 1064. While the court acknowledged in a footnote the "generally relaxed First Amendment standard applicable to the college and university setting," *Id.* at 1065 n. 6, it could find "no reason to distinguish between applying *Buckley* to state political elections and political elections at state universities." *Id.* at 1065.

I am not persuaded by *Welker's* reasoning. Contrary to the court in *Welker,* I see ample basis for distinction in the application of First Amendment principles between state or national political elections and student government elections at state universities. The basis for the distinction is adeptly explained by the Eleventh Circuit Court of Appeals in *Alabama Student*

*Party v. Student Government Association of the University of Alabama,* 867 F.2d 1344 (11th Cir.1989). There, university students challenged regulations adopted by the student government which (1) allowed distribution of campaign literature only during the three days prior to the election and only at select locations on campus; (2) banned the distribution of campaign literature on election day; and (3) allowed open forums or debates only during the week of the election. *Id.* at 1345. Following a survey of Supreme Court case law the court chose to apply a reasonableness standard, finding that it "should honor the traditional 'reluctance to trench on the prerogatives of state and local educational institutions.'" *Id.* at 1347 (quoting *Regents of the University of Michigan v. Ewing,* 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). The basis for distinction between school elections and governmental elections, the court held, is one of purpose. "[T]his is a university, whose primary purpose is *education,* not electioneering." *Id.* at 1346 (emphasis in original).

■ The court in *Welker* found the reasoning of *Alabama Student* to be inapposite because the *Alabama Student* court based its decision on the " 'right . . . to make academic judgments as to how to best allocate scarce resources.'" *Welker,* 174 F.Supp.2d at 1063 (quoting *Alabama Student,* 867 F.2d at 1345). No such considerations are presented in a campaign finance case, the court reasoned, so *Alabama Student* should not apply. 174 F.Supp.2d at 1063–64. Contrary to the *Welker* court's view, the *Alabama Student*

court did not base its decision on the university's need to allocate scarce resources.[1] The reference to the allocation of scarce resources was culled from *Widmar,* 454 U.S. at 276, 102 S.Ct. 269, which was just one of several Supreme Court cases cited and relied upon by the Eleventh Circuit in *Alabama Student,* including *Hazelwood, Bethel* and *Tinker.* Those cases collectively stand for the proposition that a state university may, in the interest of preserving the quality and availability of educational opportunities for its students, place reasonable restrictions on free speech that would be impermissible outside of the academic environment. It was on that proposition, not the need to allocate scarce resources, that the *Alabama Student* decision was based. *See Alabama Student,* 867 F.2d at 1347 ("In the present case, and in other school cases raising similar First Amendment challenges, these principles translate into a degree of deference to school officials who seek to reasonably regulate speech and campus activities in furtherance of the school's educational mission.").

■ Like *Alabama Student,* this is a case in which the Court should assess the student government policy on the basis of reasonableness. On that basis, Plaintiff Flint has a low probability of success on the merits. The declarations show that ASUM is first and foremost an educational opportunity. The ASUM constitution provides in § 1 of Article 2 that "ASUM is organized exclusively for educational and non-profit purposes." The campaign spending restrictions adopted by ASUM

1. Even if one assumes that university's right to allocate scarce resources was the basis of the *Alabama Student* decision upholding the election regulations, it would not be inapplicable to this case. The ASUM senate, the body to which Flint sought election, consists of twenty senators. Thus, the educational opportunity offered by ASUM senate partic-

ipation is limited to twenty students per year in a university with enrollment well in excess of 10,000. The university seeks to ensure equal access to that opportunity through its campaign spending restriction. A more suitable example of a decision regarding how best to allocate scarce resources is difficult to imagine.

appear to be a reasonable attempt to maintain equal access to the pedagogical benefits of ASUM participation throughout the student body. In light of the deference due the University in decisions regarding access to educational opportunities, it is unlikely that Flint's challenge will succeed on the merits.

■ In order to obtain a preliminary injunction, Flint must therefore demonstrate a significant likelihood of irreparable injury or show that the balance of hardships tips sharply in his favor. In this regard, a court should consider the degree to which the plaintiff's own delay in seeking a preliminary injunction has fostered the exigency with which the parties are later confronted. *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir.1984). "A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action...." *Id.* at 1213 (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F.Supp. 618, 622 (S.D.N.Y.1959)).

Here, Flint was undoubtedly aware of the spending cap after he was censured during the 2003–04 school year for violating its provisions in the previous year's election. As the president of ASUM, it can be assumed that Flint was aware that the ASUM bylaws authorized the senate to remove a candidate who violates the spending limits. Despite his knowledge of the possible penalties, Flint chose to once again exceed the spending limits in the 2004 elections, foregoing the alternate course of seeking an injunction against enforcement of the rule prior to the election. While Flint's delay is not alone a basis to withhold relief, it is a fact to be considered in measuring the claim of urgency. *Lydo*, 745 F.2d at 1214.

The hardship imposed on Flint by the denial of his motion is that he will not be permitted to take his seat in the ASUM senate when the 2004–05 academic year begins, a seat to which he was elected by violating ASUM bylaws. If the motion is granted, ASUM suffers hardship in that its ability to enforce its election regulations is undermined. The balance of hardships does not so favor Flint as to overcome his low likelihood of success on the merits. In my view, at this point, the balance of hardships favors of ASUM. Everyone follows the rules but Flint and he could have challenged the regulations after his first censure but chose not to. Whether that decision was for tactical reasons or not, I don't think the circumstances warrant the issuance of a preliminary injunction.

### IV. Order

Based on the foregoing discussion, IT IS HEREBY ORDERED that Plaintiff Aaron Flint's motion for a preliminary injunction (dkt. # 2) is DENIED.