Aaron **FLINT**, Plaintiff,

v.

George **DENNISON**, in his official capacity as President of the University of Montana, et al., Defendants.

No. CV 04–85–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

March 28, 2005.

James Bopp, Jr., Jeffrey Gallant, Bopp Coleson & Bostrom, Terre Haute, IN, Bridgitt Erickson, Attorney at Law, Lincoln, MT, for Plaintiff.

LeRoy H. Schramm, Helena, MT, David J. Aronofsky, Legal Counsel, Missoula, MT, for Defendants.

## ORDER

MOLLOY, Chief Judge

## I. INTRODUCTION

Plaintiff, Aaron Flint, filed this case against the University of Montana's President, the Associated Students of the University of Montana ("ASUM") and ASUM's individual members (collectively "ASUM"). He challenges ASUM bylaws that cap candidate campaign expenditures for all offices at $100.00 per election. Flint took matters in his own hands and deliberately violated the duly enacted campaign limits. After twice violating ASUM's spending restrictions—once during his successful presidential campaign in 2003 and then again in 2004 while running for senate—and a subsequent ASUM resolution preventing Flint from assuming the senatorial seat to which he was elected, Flint now contends the restrictions violate his First Amendment free speech rights.

In May 2004, I denied Flint's request for a temporary restraining order and, in August, denied Flint's motion for a preliminary injunction. Subsequently, on October 8, 2004, this Court, pursuant to Fed. R.Civ.P. 12(b), converted Defendants' motion to dismiss for failure to state a claim to a Rule 56 motion for summary judgment. For the following reasoning, I am granting Defendants' motion for summary judgment.

## II. FACTUAL BACKGROUND

To ensure all students enjoy equal access to the educational benefits available through student elections and governance, ASUM has imposed campaign finance restrictions since 1970. The student governing body chose to impose spending caps (currently set at $100.00 for all offices) and to reimburse candidates for the first $10.00 they spend participating in student electoral politics and one half of their subsequent expenditures up to the $100.00 limit. Consequently, where a student spends up to $100.00 campaigning, only $45.00 will come from the student's own resources. Absent these restrictions, ASUM believes students with financial resources not ordinarily typ-

ical for most, will monopolize the competition for limited seats by purchasing increased visibility and name recognition. This is perceived as detrimental to the educational experience of participating in the student government.

When Flint filed this case, he was ASUM President. While campaigning for that position in 2003, he violated ASUM's spending bylaws. At that time, the cap was $175.00 for a president-vice president candidate team. Flint and his running mate, current ASUM President Gale Price, spent roughly $300.00 on their campaign. ASUM censured the duo during the 2003–04 academic year—Flint's presidential term. Apparently, Flint was dissatisfied with only being censured, so he violated the rules a second time.

Flint again broke the spending rules. In spring 2004, Flint successfully ran for an ASUM senate post. During his campaign, Flint spent $214.69 despite the expenditure limit of $100.00. He didn't publicly run on a platform of deceit but he relied on financial prestidigitation to get elected. The assumption that he placed himself above ASUM's electoral rules on purpose is probably a fair one.[1] Flint disclosed his second campaign finance violation on April 26, 2004, the day before the polls opened. The ASUM senate met two days later and, pursuant to § 5 of Article V of the ASUM bylaws, voted to deny Flint his seat should he be elected. Flint responded by filing this action.

## III. ANALYSIS

### A. Summary Judgment Standards

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." A genuine issue of material fact exists if there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party meets its burden, the non-movant must designate specific facts which show that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. Standard Applicable to Assess the Constitutionality of ASUM's Campaign Expenditure Limits on Student Candidates.

As this Court determined on August 20, 2004, the deferential standard of reasonableness applies to assess the constitutionality of ASUM's spending limits and not, as Flint urges, the strict scrutiny standard applied to campaign spending restrictions by the United States Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

■ State universities maintain the undeniable right to determine "on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Widmar v. Vincent*, 454 U.S. 263, 276, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring)). This deference to academic judgments confers upon universi-

---

1. Indeed, in response to a reporter's inquiry as to whether he would encourage others to contravene election rules by spending more than the $100.00 limit during the 2004 elec- tions, Flint declared, "You're damn right I will." Curtis Wackerle, *ASUM President Opposes $100 Spending Limit*, Montana Kaiman (U. of Mont.) 5 (Mar. 16, 2004).

ties a parallel right to ensure the quality and availability of educational opportunities, even where the exercise of that right results in the exclusion of First Amendment activities. *See id.* at 277, 102 S.Ct. 269.

Public university students' First Amendment rights " 'are not automatically coextensive with the rights of adults in other settings.' " *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986)). Rather, those rights must be considered in "light of the special characteristics of the school environment." *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Consequently, student speech in the school setting is amenable to greater restriction than speech in the general public. *See Bethel,* 478 U.S. at 682–85, 106 S.Ct. 3159.

■ As indicated by the Supreme Court, a deferential standard of reasonableness governs First Amendment challenges in the educational context. Indeed, the Constitution "permit[s] reasonable regulation of speech connected activities in carefully restricted circumstances." *Tinker,* 393 U.S. at 513, 89 S.Ct. 733 (1969). Undisputed is a "[u]niversity's right to exclude even First Amendment activities that violate reasonable campus rules," *Widmar,* 454 U.S. at 277, 102 S.Ct. 269, and that schools may impose limits on school-related speech "so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood,* 484 U.S. at 273, 108 S.Ct. 562. In *Hazelwood,* the Court upheld, against First Amendment challenges, a school official's decision to remove stories on controversial topics

from the school paper. *Id.* at 276, 108 S.Ct. 562. The Court found that it could not reject as unreasonable the official's conclusion that the articles were not suitable for publication. *Id.* Similarly, in *Bethel,* the Court found school officials did not violate the First Amendment by disciplining a high school student for using vulgar language during a school assembly. 478 U.S. at 682–85, 106 S.Ct. 3159. The Court deferred to the school's judgment that such speech, though acceptable in public, would "undermine the school's basic educational mission." *Id.* at 685, 106 S.Ct. 3159. Contrarily, the Court in *Tinker* found barring students from wearing armbands to protest the Vietnam war violative of free expression, noting that school officials did not reasonably fear the protest would disrupt school work or discipline. 393 U.S. at 513–14, 89 S.Ct. 733.

Here, Flint argues against the use of a reasonableness standard and, instead, asks the Court to impose the exacting scrutiny the Supreme Court applied to campaign spending restrictions in *Buckley.* The standard applied is dispositive in that the limit in question meets the former while it likely fails the latter. Flint relies on *Welker v. Cicerone,* 174 F.Supp.2d 1055 (C.D.Cal. 2001), in which a federal district court, assessing the constitutionality of a similar university student government campaign spending limit, looked to *Buckley* as its basis for analysis. The *Welker* court noted *Buckley* was unequivocal in finding that "spending money in a political campaign directly affects freedom of speech," thus requiring the university to "demonstrate that their campaign expenditure restrictions serve a compelling interest and that they are narrowly tailored to effectuate the interest." *Welker,* 174 F.Supp.2d at 1064. While the court acknowledged in a footnote the "generally relaxed First

Amendment standard applicable to the college and university setting," *Id.* at 1065 n. 6, it found "no reason to distinguish between applying *Buckley* to state political elections and political elections at state universities." *Id.* at 1065.

■ I am not persuaded by the *Welker* court's reasoning. A significant basis exists for distinguishing the application of First Amendment principles in state or national political elections and in its application to student government elections at state universities. The Eleventh Circuit Court of Appeals explained this principle in *Alabama Student Party v. Student Government Association of the University of Alabama*, 867 F.2d 1344 (11th Cir.1989). There, university students challenged regulations adopted by the student government which (1) allowed distribution of campaign literature only during the three days prior to the election and only at select locations on campus; (2) banned the distribution of campaign literature on election day; and (3) allowed open forums or debates only during the week of the election. *Id.* at 1345. Following a survey of Supreme Court case law, the Eleventh Circuit chose to apply a reasonableness standard, finding that it "should honor the traditional 'reluctance to trench on the prerogatives of state and local educational institutions.'" *Id.* at 1347 (quoting *Regents of U. of Mich. v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)). The basis for distinction between school elections and governmental elections, the court held, is one of purpose: "[T]his is a university, whose primary purpose is *education*, not electioneering." *Id.* at 1346 (emphasis in original).

The *Welker* court found the reasoning of *Alabama Student* inapposite, stating that the *Alabama Student* court based its decision on the " 'right ... to make academic judgments as to how to best allocate scarce resources.'" *Welker*, 174 F.Supp.2d at 1063 (quoting *Alabama Student*, 867 F.2d at 1345). No such considerations are presented in a campaign finance case, the court reasoned, so *Alabama Student* should not apply. *Id.* at 1063–64.

■ However, the *Alabama Student* court did not, contrary to the *Welker* court's view, base its decision on the university's need to allocate scarce resources.[2] Rather, the court culled the allocation reference from *Widmar* as one example of when and why courts should defer to universities' academic judgments. *See Alabama Student*, 867 F.2d at 1345. Indeed, *Widmar* was just one of several Supreme Court cases cited, and relied upon, by the Eleventh Circuit in *Alabama Student*, including *Hazelwood*, *Bethel* and *Tinker*. *See id.* at 1345–47. The court based its decision upon the principles these cases collectively elucidate: a state university may, in the interest of preserving the quality and availability of educational opportunities for its students, place reasonable restrictions on free speech that would be impermissible outside of the academic environment. *See id.* at 1347 ("In the present case, and in other school cases raising

**2.** Even assuming a university's right to allocate scarce resources was the basis of the *Alabama Student* decision upholding the election regulations, it would not be inapplicable to this case. The ASUM senate, the body to which Flint sought election, consists of twenty senators. Thus, the educational opportunity offered by ASUM senate participation is limited to twenty students per year in a university with enrollment well in excess of 10,000. The university seeks to ensure equal access to that opportunity through its campaign spending restriction.

similar First Amendment challenges, these principles translate into a degree of deference to school officials who seek to reasonably regulate speech and campus activities in furtherance of the school's educational mission."). Here, the rule on spending limits not only levels the playing field, it makes the political field open to all students regardless of financial status. While not every university student chooses to participate in the educational opportunity student politics affords, the rule ensures that the occasion is not lost to the vicissitudes of student prosperity.

Participation in student government falls within the University's educational mission by instructing students on many aspects of the governmental process. Article 2, § 1 of the ASUM Constitution provides the avowed educational charge and policy of ASUM: "ASUM is organized exclusively for educational and non-profit purposes." ASUM is, and has always been, intended as a learning experience for students. *See e.g.* Decl. of Hayden Ausland ¶¶ 3–8 (describing ASUM's history and its current and historical stature as an educational opportunity). For instance, in his declaration, Hayden Ausland, ASUM's senior faculty advisor for the past 14 years and professor in Classics, details the learning experiences ASUM participation provides:

> ASUM offers students experience in many forms of leadership, through which they develop a variety of skills to handle the responsibilities that arise in student government. ASUM senators and executives learn how to address con-

flicting interests of diverse constituencies, how to make recommendations about the allocation of budgetary resources, how to negotiate with administrators over matters such as tuition and fee increases, and how to draft policies and priorities for numerous student programs.

*Id.* ¶ 6. Current ASUM President Gale Price, who previously served as Vice President, describes her own participation as strengthening her decision-making skills, teaching her how to work for the good of the University closely aside people with whom she often disagrees, and providing her with leadership experience. Decl. of Gale Price ¶ 6.

Additionally, all ASUM executives and senators attend seminars during the fall semester. ASUM Bylaws art. II, §§ 2(D) & 3(D). The substance of these classes include topics such as parliamentary procedure, service learning and leadership skills. Ausland Decl. ¶ 7. Along with classes, participation in ASUM requires students learn how to conduct themselves in accordance with Robert's Rules of Order, *see* ASUM Const. art. 4, § 7, an education on how to bring order to the sometimes chaotic debating and voting lost on many of today's aspiring public servants. The learning and experience gained by ASUM participation is integral to participants' education.

ASUM is a learning opportunity provided students as part of the University of Montana's educational mission.[3] ASUM's

---

**3.** Professor Hayden Ausland notes the educational opportunity service in student government provides for those wishing to pursue a career in public service. Ausland Decl. ¶ 8. In doing so, he points to the successes of past ASUM members such as former U.S. Senator Lee Metcalf, former University of Montana

President Robert Panzer, and former Montana Attorney General Joe Mazurek. *Id.* One cannot question that participation in ASUM provides excellent preparation for such careers in public service but, as Professor Ausland remarks, "it is not yet that career itself." *Id.*

role as an educational opportunity means the application of the reasonableness standard of review to the regulations is appropriate and explains why the student spending limits are not subject to the same standard as regulations imposed on candidates running for national or state offices.[4] Thus, ASUM regulations are subject to a reasonableness standard.

## C. Reasonableness of ASUM's Student Campaign Spending Restrictions.

 According the deference due the University's academic decisions regarding access to its educational opportunities, *see Widmar*, 454 U.S. at 276–77, 102 S.Ct. 269, I cannot say ASUM's campaign spending restrictions are unreasonable. As the declarations in this case make clear, ASUM's expenditure regulations are an effort by the University to assure that all students, regardless of personal or financial circumstances, have equal access to the educational opportunities ASUM participation provides. *See e.g.* Austen Decl. ¶ 9. Without some spending limits, financially able students have an advantage in attaining the learning experience of ASUM participation, *see* Price Decl. ¶ 6.

Guaranteeing that students need not have substantial personal resources to have a fair opportunity to run for, and win election to, ASUM appears particularly important at the University of Montana. Over two-thirds of the student population at the University of Montana receive financial aid, including three-quarters of in-state students. Decl. of Myron Hanson ¶ 6. Additionally, in 2002–03, 34% of undergraduates received Federal Pell Grants, which only the most financially needy students may obtain. *Id.* ¶ 4. According to the Director of the University's Financial Aid Office, these percentages exceed most flagship public universities in the U.S. *Id.* Consequently, these students with limited financial resources are less likely to have access to the educational experience ASUM participation provides.

Rendering student government an educational opportunity for only those students who can afford to run, *see* Price Decl. ¶ 6, is contrary to a university's educational mission. Professor Ausland adeptly explains this diametric contradiction: "To allow a wealthy student to monopolize access to election would be like allowing that same wealthy student a first shot at enrolling in some sought-after history class ... it would be unworthy of an American institution of public higher education." Ausland Decl. ¶ 9.

To paraphrase an argument of Seth Waxman, counsel for the defendants in *McConnell v. FEC*, 539 U.S. 981, 124 S.Ct. 33, 156 L.Ed.2d 693 (2003), if we reach the stage where participation in student government is perceived as only given to those interests with large money contributions, the fundamental predicate of student governance breaks down. When the cynicism of wealth invades the academy, students learn not the lessons of orderly governance but instead are imbued with the anti-egalitarian notion that wealth is power.

Overall, ASUM's spending restrictions are a reasonable attempt to maintain equal access to the pedagogical benefits of ASUM participation throughout the student body.

---

**4.** As Defendants point out, "Unlike ASUM, neither Congress nor the Montana Legislature exists to further the education of persons elected to serve there (even if that may be an incidental effect in some cases)." Def.'s Br. Opposition to Pl.'s Mot. for Prelim. Inj. 9.

## IV. CONCLUSION

Because ASUM's campaign expenditure restrictions are reasonable in light of ASUM's educational purpose, they do not violate Flint's First Amendment free speech rights.

Accordingly, it is HEREBY ORDERED:

1. Defendants' Motion to Dismiss (**Dkt. # 66**)converted to Rule 56 Motion for Summary Judgment is GRANTED;

2. Judgment shall be entered for Defendants and all other pending motions shall be DENIED as moot.